# TABLE OF CONTENTS

**PAGE NOS.**

EXHIBIT 1................................................................................................8-27

EXHIBIT 2................................................................................................29-30

# EXHIBIT 1

8.

# OPERATING AGREEMENT

This OPERATING AGREEMENT is entered into on January 18, 2006, by the parties set Forth in Exhibit 1 attached hereto and incorporated by reference (referred to individually as a Member and collectively as the Members).

## RECITALS

**WHEREAS**, the Members desire to form a limited liability Company (Company) under the laws of the State of Nevada; and

**WHEREAS**, the Members enter into this Operating Agreement in order to form and provide for the governance of the Company and the conduct of its business and to specify their relative rights and obligations.

**NOW THEREFORE**, the Members hereby agree as follows:

## ARTICLE I: DEFINITIONS

The following capitalized terms used in the Agreement have the meanings specified in the Article or elsewhere in the Agreement and when not so defined will have the meanings set forth under the laws of the State of Nevada.

1.1. "Agreement" means the Operating Agreement, as originally executed and as amended from time to time.

1.2. "Articles of Organization" means Articles of Organization as defined under the laws of the State of Nevada.

1.3. "Assignee" means a Person who has acquired a Member's Economic Interest in the Company, by way of a Transfer in accordance with the terms of this Agreement, but who has not become a Member.

1.4. "Assigning Member" means a Member who by means of Transfer has transferred an Economic Interest in the Company to an Assignee.

1.5. "Capital Account" means, as to any Member, a separate account maintained and adjusted in accordance with Article III, Section 3.3.

1.6. "Capital Contribution" means, with respect to any Member, the amount of the money and the Fair Market Value of any property (other than money) contributed to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take "subject to" under IRC Section 752) in consideration of a Percentage Interest held by such Member. A Capital Contribution will not be deemed a loan.

1.7. "Capital Event" means a sale or disposition of any of the Company's capital assets, the receipt of insurance and other proceeds derived from a casualty loss or the involuntary conversion of Company property, the receipt of proceeds from a refinancing of Company property, or a similar event with respect to Company property or assets.

1.8. "Code" or "IRC" means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.9. "Company" means the Company named in Article II, Section 2.2.

1.10. "Economic Interest" means a Person's right to share in the income, gains, losses, deductions, credit or similar items of, and to receive distributions from the Company, but does not include any other rights of a Member, including the right to Vote or to participate in management.

1.11. "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.12. "Encumbrance" means, with respect to any Membership Interest, or any element thereof, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in the Agreement), option, or preferential right to purchase.

1.14. "Gross Asset Value" means, with respect to any item of property of the Company, the item's adjusted basis for federal income tax purposes, except as follows:

The Gross Asset Value of any item of property contributed by a Member to the Company will be the fair market value of such property, as mutually agreed by the contributing Member and the Company. The Gross Asset Value of any item of Company property distributed to any Member will be the fair market value of such items of property on the date of distribution.

1.15. "Initial Member" or "Initial Members" means those Persons whose names are set forth in Exhibit 1. A reference to an "Initial Member" means any of the Initial Members.

1.16. "Involuntary Transfer" means, with respect to any Membership Interest, or any element thereof, any Transfer or Encumbrance, whether by operation of law, pursuant to court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise including a purported Transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.17. "Losses." See "Profits and Losses."

1.18. "Majority of Members" means a Member or Members whose Percentage Interests represent more than 50 percent of the Percentage Interests of all the Members.

1.19. "Meeting" is defined in Article V, Section 5.5.

1.20. "Member: means an Initial Member or a Person whom otherwise acquires a Membership Interest, as permitted under this Agreement, and who remains a Member.

1.21. "Notice" means a written notice required or permitted under this Agreement. A notice will be deemed given or sent when deposited, as certified mail or for overnight delivery, postage and fees prepaid, in the United States mail; when delivered to Federal Express, United Parcel Service, DHL Worldwide Express, or Airborne Express, for overnight delivery, charges prepaid or charged to the sender's account; when personally delivered to the recipient; when transmitted by electronic means such as a fax and such transmission is electronically confirmed as having been successfully transmitted; or when delivered to the home or office of a recipient in the care of a Person whom the sender has reason to believe will promptly communicate the notice to the recipient.

1.22. "Percentage Interest" means a fraction, expressed as a percentage, the numerator of which is the total of a Member's Capital Account and the denominator of which is the total of all Capital Accounts of all Members.

1.23. "Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability Company, or other entity, whether domestic or foreign.

1.24. "Profits and Losses" means, for each fiscal year or other period specified in this Agreement, an amount equal to the Company's taxable income or loss for such years or period, determined in accordance with IRC Section 703(a).

1.25. "Proxy" means a signed written authorization giving another person the power to exercise the voting rights of that Member. A Proxy may not be transmitted orally.

1.26. "Regulations" ("Reg") means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the Code, as such Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.27. "Substituted Member" is defined in Article VIII, Section 8.7.

1.28. "Successor in Interest" means an Assigned, a successor of a Person by merger or otherwise by operation of law, or a Transferee of all or substantially all of the business or assets of a Person.

1.29. "Transfer" means, with respect to a Membership Interest, or any element of a Membership Interest, any sale, assignment, gift, Involuntary Transfer, or other disposition of a Membership Interest or any element of such a Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.30. "Triggering Event" is defined in Article VIII, Section 8.3.



1.32. "Voting Interest" means, with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Laws of the State of Nevada, except as limited by the provisions of this Agreement. A Member's voting Interest will be directly proportional to that Member's Percentage Interest.

1.33 "Monthly Expense" means, with respect to a Member, the Member must pay a monthly fee to the Company, which will be based upon that Member's percentage of ownership. Such fees will be utilized for the maintenance of the Company. Currently the maintenance costs are as set forth in Exhibit 2. Additional costs not included in Exhibit 2 are costs, which are directly related to the yacht repair in general.

1.34    "Members' Fees" means fees, which are charged to all Members for all other costs related to the usage of the yacht as outlined, but are not limited to, as referenced in Exhibit 3.

## ARTICLE II: ARTICLES OF ORGANIZATION

2.1 On or before the execution of the Agreement, the Members shall cause Articles of Organization, in the form attached to the Agreement as Exhibit 4, to be filed with the Nevada Secretary of State.

2.2. The name of the Company shall be Yacht Club, LLC.

2.3. The principal executive office of the Company shall be at 4995 Portuguese Lane, Stillwater/Fallon, Nevada 89407, or such other place as may be determined by the Members from time to time. The mailing address for all documents will be P.O. Box 6283, San Diego, CA 92166, 1-800-582-7099, (619) 224-3022.

2.4. The initial agent for service of process on the Company shall be PETER BLAIR. A Majority of Members may, from time to time, change the Company's agent for service of process.

2.5. The Company will be formed for the purpose of engaging in any lawful act or activity for which a Limited Liability Company may be organized under the laws of the State of Nevada.

2.6. The term of existence of the Company will commence on the effective date of filing of Articles of Organization with the Nevada Secretary of State, and will continue until terminated as set forth in the Articles of Organization, unless sooner terminated by the provisions of the Agreement or as provide by law.

2.7. The names and addresses of the Initial Members are as set forth in Exhibit 1.

2.8. The name(s) and business addresses of the Manager(s) are set forth in Exhibit 5.

## ARTICLE III: CAPITALIZATION

3.1. Because it is the goal of this entity to purchase a specific asset, specifically a 100% ownership interest in the Yacht to be "Trinket," it is uncertain at the inception whether sufficient assets will be raised by this entity to achieve this goal. Accordingly, all Member Capital Contributions will be held by Escrow until such time as the Manager(s) make the decision to either expend the Escrow monies to acquire the asset or the decision is made to return the Capital Contributions to the Contributing Members. Once the certain value of the capital in escrow has been achieved, as determined by the Initial Manager or Manager(s) and any outstanding loan(s) or lien(s) are paid in full, all outstanding percentage ownership in the vessel will be transferred to Yacht Club LLC.

3.2. Any Member who places their capital into the Escrow, described above, will immediately have all rights to the use of the vessel as stated within this Agreement. Accordingly, while Escrow is pending, the manager and Members will have the rights as stated within this Agreement until such time as Escrow is either closed or terminated. During this Escrow period, the Operating Agreement will be in full force and effect, all terms and conditions concerning the purpose and use of the Yacht Club Assets will be applied. When escrow closes the Manager(s) Captain (Peter Blair, Kevin Smith, Dave Moniz and or assigns) will receive 20% percent ownership of the Company.

3.3 The Escrow fund will not be utilized until the close of Escrow. Any interest earned in Escrow will be that of the Company. Should the Manager(s) make the determination that it is unlikely that sufficient funds will be deposited into Escrow to achieve the purpose of the Company, at the manager's sole discretion the Manager(s) can make the decision not to complete the transaction. In the event the managers determine to terminate the transaction, they will terminate the Escrow and potential Members will receive refunds of their initial investment. Should this occur, the Operating Agreement will become invalid and all participants who had invested money into Escrow will forfeit any rights under this Operating Agreement.

3.4 Each Member shall contribute to the capital of the Company. Each Member's contribution to the capital of the Company shall be deemed to be the Member's Capital Contribution, and will consist of the money, property or services specified in Exhibit 6 to the Agreement. The Fair Market Value of each item of contributed property as agreed between the Company and the Member contributing such property is set forth in Exhibit 6. Unless otherwise agreed in writing by all Members, no Member will be required to make additional Capital Contributions.

3.5    The Company has authorized 100% percent ownership of the Yacht 'TRINKET' to be sold. At present, the current value for a minimum of 8% percent ownership interest in the Company is $190,000.

3.6. If a Member fails to make a required Capital Contribution within 10 days after the effective date of this Agreement, or such other date as agreed to by the Members, that Member's entire Membership Interest shall terminate and that Member shall indemnify and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees caused by the failure to make such Capital Contribution.

3.7. An individual Capital Account will be maintained for each Member consisting of that Member's Capital Contribution, (1) increased by that Member's share of Profits, if allocated to the Capital Account by the Member, (2) decreased by that Member's share of losses and Company expenses, and (3) adjusted as required in accordance with applicable provisions of the Code and Regulations.

3.8. A Member will not be entitled to withdraw any part of their Capital Contribution or to receive any distributions, whether of money or property from the Company, except as provided in this Agreement.

3.9. No interest will be paid on funds or property contributed to the capital of the Company or on the balance of a Member's Capital Account.

3.10. A Member will not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company accept as otherwise provided by law or in this Agreement as per Exhibits 2 and 3.

3.11.    A Member's Initial Contribution will be reimbursed up to 100% percent to all Members, other than the Initial Member Greg Strasburg, once the yacht is sold. A Member will have the option of placing these funds into another Company Asset. In the event a Member opts to allocate or distribute their Membership to another approved Assignee, profit may be realized in such Transfer. In such case, any profits realized from such Transfer will be shared with the Company. The Company will receive a percentage of these funds based upon the Ownership Interest of the Assigning Member (Example: A Member holds an 8% percent Ownership Interest and receives $1,000 profit for such Transfer. Assigning Member will receive $80 and the Company will retain the remaining $920 for use by the Managers for the Company).

3.12.    In the event that the vessel is sold, prior to close of escrow, Manager(s) Captain will receive 10% ten percent of the gross sales price of the vessel. Blair and Moniz will divide that sum between themselves with seventy percent to Blair and thirty percent to Moniz.

3.13. Except as otherwise provided in this Agreement, no Member will have priority over any other Member, with respect to the return of a Capital Contribution or distributions or allocations of income, gain, losses, deductions, credits or items thereof.

## ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS

4.1. Except as otherwise provided in this Agreement, the Profits and Losses of the Company and all items of Company income, gain, loss, deduction, or credit will be allocated, for the Company book purposes and for tax purposes, to a Member in accordance with that Member's Percentage Interest.

4.2. Notwithstanding any other provisions of this Agreement, profits will be distributed first to the Initial Members who have made cash or property contributions. The distributions will be in a total amount equal to the Initial Member's initial cash contributions as set forth in Exhibit 6. Thereafter, profits will be allocated as set forth in Section 3.7 of this Agreement.

4.3. If any Member unexpectedly receives any adjustment, allocation, or distribution described in Reg Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), items of Company gross income and gain will be specifically allocated to that Member in an amount and manner sufficient to eliminate any deficit balance in that Member's Capital Account created by such adjustment, allocation, or distribution as quickly as possible. Any special allocation under this Section will be taken into account in computing subsequent allocations of Profits and Losses so that the net amount of allocations of income and loss and all other items will, to the extent possible, be equal to the net amounts that would have been allocated if the unexpected adjustment, allocation, distribution had not occurred. The provisions of this Section and the other provisions of this Agreement relating to

4.4. Any unrealized appreciation or unrealized depreciation in the values of Company property distributed in kind to all the Members will be deemed to be Profits or Losses realized by the Company immediately prior to the distribution of the property and such Profits or Losses will be allocated to the Members' Capital Accounts in the same proportions as Profits are allocated under Section 4.1. Any property so distributed will be treated as a distribution to the Members to the extent of the Fair Market Value of the property less the amount of any liability secured by and related to the property. Nothing contained in the Agreement is intended to treat or cause such distributions to be treated as sales for value. For the purposes of this Section, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the Fair Market Value of such property and the Company's basis for such property.

4.5. In the case of a Transfer of an Economic Interest during any fiscal year, the Assigning Member, and the Assignee, will have allocated their prorated share of Profits or Losses based on the number of days each held the Economic Interest during that fiscal year.

4.6. Except as otherwise provided in this Agreement, all cash resulting from the normal business operations of the Company and from a Capital Event will be distributed among the Members in proportion to their Percentage Interests at such times as the Members may agree.

4.7. If the proceeds from a sale or other disposition of an item of the Company consist of property other than cash, the value of such property will be as determined by the then market conditions which include, but are not limited to, the expertise of a qualified marine surveyor/assessor, and the actual sales price. Such non-cash proceeds will then be allocated among all the Members in proportion to their Percentage Interests. If such non-cash proceeds are subsequently reduced to cash, such cash will be distributed to each Member in accordance with Article IV.

4.8. Notwithstanding any other provision of this Agreement to the contrary, when there is a distribution in liquidation of the Company, or when any Member's Interest is liquidated, all items of income and loss first will be allocated to the Member's Capital Accounts under Article IV, and other credits and deductions to the Member's Capital Accounts will be made before the final distribution is made. The final distribution to the Members will be made to the Members to the extent of and in proportion to their positive Capital Account balances.

## ARTICLE V. MANAGEMENT

5.1. The Persons named as Managers in Article II, Section 2.8 or any successors, selected as provided in Section 5.3 shall manage the Business of the Company. Except as otherwise provided in this Agreement, all decisions concerning the management of the Company's day-to-day business will be made by the Vote of a Majority, by number, of the Managers.

5.2. Each Manager shall serve until the earlier of (1) the Manager's resignation, retirement, death or disability; (2) the Manager's removal by the Members; and (3) the expiration of the Manager's term as Manager, if a term has been designated by a Majority of Members. A new Manager will be appointed by a Majority of Members on the occurrence of any of the foregoing events.

5.3. Each Manager will be appointed by a Majority of Members for (1) a term expiring with the appointment of a successor, or (2) a term expiring at a definite time specified by a Majority of Members in connection with such appointment. A Manager who is not also a Member may be removed with or without cause at any time by action of a Majority of Members. A Manager who is a Member may be removed only on the Vote of all other Members and the execution and filing of a Certificate of Amendment of the Articles of Organization of the Company.

5.4. The Manager, who will be the President of the Company, shall have the powers and duties described in Section 5.7 hereof and such other powers and duties as may be prescribed in this Agreement or by the Members. Notwithstanding the foregoing, the Manager will not take any of the following actions on behalf of the Company unless a Majority of Members have consented to the taking of such action.

(a) Any act that would make it impossible to carry on the ordinary business of the Company;

(b) Any confession of a judgment against the Company;

(c) The dissolution of the Company;

(d) The disposition of any part of the Company's assets not in the ordinary course of business;

(e) The incurring of any debt not in the ordinary course of business;

(f) A change in the nature of the principal business of the Company:

*P.B.*

*G.S.*

13

(g) The incurring of any contractual obligation or the making of any capital expenditure with a total amount of more than $10,000;

(h) The filing of a petition in Bankruptcy or the entering into of an arrangement among creditors; and

(i) The entering into, on behalf of the Company, of any transaction constituting a reorganization.

5.5. Actions of the Managers will be taken at Meetings or as otherwise provided in this Section by a Majority. No regular Meetings of the Managers need to be held. The President or any two Managers may call a Meeting of Managers by giving Notice of the time and place of the Meeting at least seven days prior to the time of the holding of the Meeting. The Notice need not specify the purpose of the Meeting, nor the location if the Meeting is to be held at the principal executive office of the Company. A Majority of Managers shall constitute a quorum for the transaction of business at any Meeting of the Managers.

The transactions of the Managers at any Meeting, however called or noticed, or wherever held, will be as valid as though transacted at a Meeting duly held after call and notice if a quorum is present and if, either before or after the Meeting, each Manager not present signs a written waiver of notice or a consent to the holding of such Meeting or an approval of the minutes of such Meeting.

Any action required or permitted to be taken by the Managers under this Agreement may be taken without a Meeting if a Majority of the Managers individually or collectively consent in writing or by telephone to such action.

Managers may participate in the Meeting through the use of a conference telephone or similar communications equipment, provided that all Managers participating in the Meeting can hear each other.

The President will keep, or cause to be kept, with the books and records of the Company full and accurate minutes of all Meetings, notices and waivers of notices of Meetings, and all written consents to actions of the Managers.

5.6. The Managers will be entitled to compensation for the Managers' services as determined by the Members, and to reimbursement for all expenses reasonably incurred by the Manager in the performance of the Managers' duties, as stated in Exhibits 2 and 3.

5.7. The Company will have a President, who will be a Manager. The President will be the chief executive officer of the Company and will have general supervision of the business and affairs of the Company, will preside at all Meetings of Members and of Managers, and shall have such other powers and duties usually vested in a chief executive officer. A Majority of the Members may provide for additional officers of the Company, may alter the powers and duties of the President, and will establish the powers and duties of all other officers and the compensation of all Company officers.

5.8. The Manager(s) will cause all assets of the Company, whether real or personal, to be held in the name of the Company through an assignment or other means sufficient to transfer all right, title and interest in the property to the Company.

5.9. All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at such locations as shall be determined by the Manager. Withdrawal from such accounts will require only the signature of one Manager or such other Person or Persons as the Manager(s) may designate.

5.10. The Manager(s) will be in charge of notifying the Members of all ongoing and future cost related to maintenance and the repair of the vessel. The Members will pay as per their percentage of Ownership Interest of their share of the ongoing monthly cost (Example: If a Member holds a 8% percent Ownership Interest and the monthly cost is $1,000, then a 8% percent Membership Owner will pay $80.)

The maintenance as outlined herein (as per Exhibit 2), covers the below listed cost, but is not limited to: slip rent, Direct TV, satellite telecommunications, insurance, labor, food, fuel, oil, filters, belts, paint, cleaning supplies and other minor parts. It is estimated that these ongoing maintenance costs are between $7,000-$8,000 per month. These maintenance fees will allow the yacht to be maintained in its present ready-to-cruise-anywhere condition. Large or unexpected repair cost for the yacht will be paid equally by the Members based upon their Ownership Interest. (Example: If a Member holds a 8% percent Ownership Interest and the monthly cost is $1,000, then that 8% percent Membership Owner will pay $80.)

These repair funds will be paid as soon as work commences and on or before the work is finished. The Manager(s) of the Company will submit a written estimate to the Membership 10 days prior to the commencement

GS14.

any funds for yacht maintenance in relation to their percentage of ownership for such work. (Example: Manager(s) holds 20% percent Ownership Interest and the repair cost is $1,000. Manager(s) will pay nothing.)

5.11. One or both of the Managers will be present when the yacht is in use at all times. Members will have unlimited access to use the yacht and be allowed to have guest(s) present while that Member is using the yacht. The Member's guest(s) are the responsibility of that Member. Such guest(s) must sign a Release of Liability, as per attached Exhibit 7, if required by the Manager(s). A Member must notify the Company at least 10 days prior to the contemplated use of the yacht. Such notification will occur within that 30-day period associated with that desired use. Member can phone, fax, e-mail or access the Yacht Club web site www.yachtclubllc.com to schedule the Member's or guest use of the yacht.

The time of the use of the yacht will be determined on a priority basis within each 30-day period from the previous time of use by that Member. In the event that a Member or guest does not use their reserved time of use, that Member or guest must notify the Manager(s) within 20 days prior to the reserved date of use. This will allow other Member(s) to have the opportunity to utilize the yacht unimpeded. In the event a Member fails to use the yacht, as reserved, the Manager(s) will use their discretion as to what the financial hardship to the Company has been created by such cancellation, and damages may be assessed to that Member. Such damages will at no time exceed $2,500 per cancellation event. In the event a cancellation is of an emergency nature, such cancellation damages will be determined at the Manager(s) discretion.

A Member must pay a fee for securing a future date outside of that Member(s)scheduled 30-day period. The Manager(s) has discretion as to what this charge will be. Additionally, the Manager(s) will notify all other Members as to the request of future use by the requesting Member. Members will be given an opportunity to voice their concerns over such request within five (5) days of such notification.

The yacht is for the use of Members only. While Members can have guests on the yacht, Members, with the approval of the Company, can allow a guest to utilize the yacht in their stead, the Member is responsible for payment to the Club for any and all operating, costs, fees, etc. Guests are not allowed to pay monies or reimburse any expense for the Members' utilization of the yacht whether the Member utilizes it personally or allows a guest to utilize it in his stead. The Club will not accept any monies from any individual or entity that is not a Member under this Agreement. Any guest, whether accompanied by the Member, or utilizing the vessel independent of that Member, must sign off on Rules and Regulations, including an agreement to indemnify the entity for any and all damage to the vessel and/or any damage caused to any property or person as resulting from their use of the vessel. A guest must also sign an agreement whereby they are assuming the risk of personal injury to themselves and their property arising out of the use of the vessel.

While the yacht is in use by a Member or a Member's guest(s), an accident or damage occurs to the yacht from that individual's negligence, the responsible party for such damage will be liable for the repair of such damage. The Manager(s) on board the yacht will immediately notify the responsible Member, or guest, as to the cost for repairing such damage. The Member or guest(s) must pay for the repair of the damage within five days after being notified of the cost to repair yacht damage.

A Member or their guest, must arrange with the Manager(s) prior to their use of the vessel, their desire with regard to the daily cleaning of the vessel as well as cleaning at the conclusion of their use. The cost for daily cleaning of the stateroom(s) and head(s) is to be determined by the Manager(s) before any use event occurs. Payment for such services (as per Exhibit 3) must be paid either during or at the end of such use periods. Reimbursement for any fuel, food/drinks, oil, and filters which are used during a Member(s) and/or guest(s) use, must be paid at the end of each use period. The cost for such items is to be determined by the Manager(s).

## ARTICLE VI: ACCOUNTS AND RECORDS

6.1. Complete books of the account of the Company's business, in which each Member(s) transaction will be fully and accurately entered, will be kept at the Company's principal executive office and will be open to inspection and copying by each Member or the Member's authorized representatives on reasonable Notice during normal business hours. The costs of such inspection and copying shall be borne by the Member.

6.2. The Company for Federal Income Tax purposes will keep financial books and records of the Company on the cash method of accounting, which will be a method of accounting followed. A balance sheet and income statement of the Company will be prepared promptly following the close of each fiscal year in a manner appropriate to and adequate for the Company's business and for carrying out the provisions of this Agreement. The fiscal year of the Company will be January 1 through December 31.

6.3. At all times during the term of existence of the Company, and beyond that term, if a Majority of the Members deem it necessary, the Members will keep, or cause to be kept, the books of account referred to in Section

P-B.   15.

(a) A copy of the Articles of Organization, as amended;

(b) A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses of each Member;

(c) Executed counterparts of this Agreement, as amended;

(d) Any powers of attorney under which the Articles of Organization or any amendments thereto were executed:

(e) Financial statements of the Company for the six most recent fiscal years;

(f) Copies of the Company's Federal, State, and local income tax or information returns and reports, if any, for the six most   recent taxable years; and

(g) The books and records of the Company as they relate to the Company's internal affairs for the current and past six fiscal years.

If a Majority of the Members deem that any of the foregoing items will be kept beyond the term of existence of the Company, the repository of said items will be as designated by a Majority of Members.

6.4. Within 90 days after the end of each taxable year of the Company, the Company will send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns, and a copy of the Company's Federal, State and local income tax or information returns for such year.

## ARTICLE VII: MEMBERS AND VOTING

7.1. There shall be only one class of Membership and no Member will have any rights or preferences in addition to or different from those possessed by any other Member. Each Member will Vote in proportion to the Member's Percentage Interest as of the governing record date, determined in accordance with Section 7.2. Any action that may or the Members must take that will be by a Majority of Members, except that the following actions will all require the unanimous Vote of the Members:

(a) The creation of a new Membership Interest;

(b) The acceptance of a new Member;

(c) The transfer of a Membership Interest and the admission of the Assignee as a Member of the Company;

(d) Any amendment of the Articles of Organization or this Agreement; or

(e) Compromise of the obligation of a Member to make a Capital Contribution.

7.2. The record date for determining the rights at any Membership Meeting, to Vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by a Majority of Members, provided that such record date will not be more than 60, nor less than 10 days prior to the date of the Meeting, nor more than 60 days prior to any other action. In the absence of any actions setting a record date, the record date will be determined in accordance with Nevada Law.

7.3. At all Meetings of Members, a Member may Vote in person or by Proxy. Such Proxy will be filed with any Member before or at the time of the Meeting, and may be filed by facsimile transmission or electronic mail to a Member at the principal executive office of the Company or such other address as may be given by a Majority of Members to the Members for such purposes.

## ARTICLE VIII: TRANSFERS OF MEMBERSHIP INTERESTS

8.1. A Member may withdraw from the Company at any time by giving Notice of Withdrawal to all other Members at least 120 calendar days before the effective date of withdrawal. Withdrawal shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of withdrawal. A withdrawing Member shall divest the Member's entire Membership Interest before the effective date of withdrawal in accordance with the transfer restrictions and option rights set forth below.

8.2. Except as expressly provided in this Agreement, a Member will not Transfer any part of the Member's Membership Interest in the Company, whether now owned or hereafter acquired, unless (1) the other Members

Membership Interest to be transferred, when added to the total of all other Membership Interests transferred in the preceding 12 months, will not cause the termination of the Company under the Code. No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Membership Interest in the Company unless such Encumbrance has been approved in writing by all the other Members. Any Transfer or Encumbrance of a Membership Interest without such approval shall be void. Notwithstanding any other provision of the Agreement to the contrary, a Member who is a natural person may transfer all or any portion of his or her Membership Interest to any revocable trust created for the benefit of the Member, or any combination between or among the Members, the Member's spouse, and the Member's issue; provided that the Member retains a beneficial interest in the trust and all of the Voting Interest included in such Membership Interest. A transfer of a Member's entire beneficial interest in such trust or failure to retain such voting interest shall be deemed a Transfer of a Membership Interest.

8.3. On the happening of any of the following events (Triggering Events) with respect to a Member, the Company and the other Members will have the option of purchasing all or any portion of the Membership Interest in the Company of such Member (Selling Member) at the price and on the terms provided in Section 8.6 of this Agreement:

(a) The death or incapacity of a Member;

(b) The bankruptcy of a Member;

(c) The winding up and dissolution of a corporate Member, or merger with other corporate reorganization of a corporate Member as a result of which the corporate Member does not survive as an entity;

(d) The withdrawal of a Member; or

(e) Except for the events stated in Section 8.4, the occurrence of any other event that is, or that would cause, a Transfer in contravention of the Agreement. Each Member agrees to promptly give Notice of a Triggering Event to all other Members.

8.4. Notwithstanding any other provisions of the Agreement:

(a) If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards a Membership Interest, or any portion thereof, to that Member's spouse (an Award), then, notwithstanding that such transfer would constitute a non-permitted Transfer under this Agreement, that Member will have the right to purchase from his or her former spouse the Membership Interest, or portion thereof, that was so transferred, and such former spouse will sell the Membership Interest or portion thereof to that Member at the price set forth in Section 8.6 of this agreement. If the Member has failed to consummate the purchase within 45 days after the Award (the Expiration Date), the Company, and the other Members, will have the option of purchasing from the former spouse the Membership Interest, or portion thereof, pursuant to Section 8.5 of this Agreement; provided that the option period will commence on the latter of (1) the day following the Expiration Date, or (2) the date of the actual notice of the Award.

(b) If, by reason of the death of a spouse of a Member, any portion of a Membership Interest is transferred to a Transferee other than (1) that Member or (2) a trust created for the benefit of that Member (or for the Benefit of that Member and any combination between or among the Member and the Member's issue) in which the Member is the sole Trustee and the Member, as Trustee or individually possesses all of the Voting Interest included in that Membership Interest, then the Member will have the right to purchase the Membership Interest or portion thereof from the estate or other successor of his or her deceased spouse or Transferee of such deceased spouse, and the estate, successor, or Transferee will sell the Membership Interest or portion thereof at the price set forth in Section 8.6 of this Agreement. If the Member has failed to consummate the purchase within 45 days after the date of death (the Expiration Date), the Company and the other Members will have the option of purchasing from the estate or other successor of the deceased spouse the Membership Interest or portion thereof pursuant to Section 8.5 of this Agreement; provided that the option period will commence on the latter of (1) the day following the Expiration Date, or (2) the date of the actual notice of death.

8.5. On the receipt of Notice by the other Members as contemplated by Section 8.1 and on receipt of actual notice of any Triggering Event (the date of such receipt is hereinafter referred to as the "Option Date"), the Manager(s) will promptly give notice of the occurrence of such a Triggering Event to each Member and the Company shall have the option, for a period ending 30 calendar days following the determination of the purchase price as provided in Section 8.6, to purchase the Membership Interest in the Company to which the option relates, at the price and on the terms provided in Section 8.6 and the other Members, pro rata in accordance with their prior

Membership Interest in the Company not purchased by the Company, on the same terms and conditions as apply to the Company. If all other Members do not elect to purchase the entire remaining Membership Interest in the Company, the Members electing to purchase will have the right, pro rata in accordance with their prior Membership Interest in the Company, to purchase the additional Membership Interest in the Company available for purchase. The options to purchase, held by the Company and its current Members, create no obligation upon the option holders to purchase the interests offered.

8.6. The purchase price of the Membership Interest that is the subject of an option under this Agreement shall be the Fair Market Value of such Membership Interest as determined under this Section. Each of the selling and purchasing parties will use his, her, or its best efforts to mutually agree on the Fair Market Value. If the parties are unable to so agree within 30 days of the date on which the option is first exercisable (the Option Date), the selling party will appoint, within 40 days of the Option Date, an appraiser, and the purchasing party will appoint within 40 days of the Option Date, an appraiser. The two appraisers will within a period of five additional days, agree on and appoint an additional appraiser. If the two appraisers cannot agree on a third appraiser then the third appraiser will be appointed by a Majority of the Members. The three appraisers will, within 60 days after the appointment of the third appraiser, determine the Fair Market Value of the Membership Interest in writing and submit their report to all the parties. The Fair Market Value will be determined by disregarding the appraiser's valuation that diverges the greatest from each of the other two appraisers' valuations, and the arithmetic mean of the remaining two appraisers' valuations will be the Fair Market Value. Such value will never be lower than the amount of the Initial Member's Contribution. Each purchasing party will pay for the services of the appraiser selected by it, and one-half of the fees charged by the third appraiser. The option purchase price as so determined will be payable in cash.

8.7. Except as expressly permitted under Section 8.2., a prospective transferee (other than an existing Member) of a Membership Interest may be admitted as a Member with respect to such Membership Interest (Substituted Member) only (1) on the unanimous Vote of the other Members in favor of the prospective transferee's admission as a Member, and (2) on such prospective transferee's executing a counterpart of this Agreement as a party hereto. Any prospective transferee of a Membership Interest shall be deemed an Assignee, and, therefore, the owner of only an Economic Interest until such prospective transferee has been admitted as a Substituted Member.

8.8. Any Person admitted to the Company as a Substituted Member shall be subject to all provisions of this Agreement.

8.9. (a) As the transfer of the Strasburg Trust's ownership would constitute a material change in the Company, such will be handled specially. In the event that Initial Manager Greg Strasburg, as the representative of the Strasburg Trust desires to transfer his Membership interest, Strasburg shall notify the other managers. Manager(s) Captain will receive 50% percent of the proceeds from the sale of the last 8% percent ownership in the Company. The Company for the sole benefit of the Manager(s) Captain will hold all proceeds. These proceeds will be paid to the Manager(s) Captain by the Company over a period of 3 three years. Upon the conclusion of the first year, 20% of these funds will be paid to the Manager(s) Captain. Upon the conclusion of the second year, 30% of these funds will be paid to the Manager(s) Captain. Upon the conclusion of the third year 50% or all remaining funds held by the Company will be paid to the Manager(s) Captain. In the event the Manager(s) Captain does not complete this three-year Term, payment of these funds will be paid on a pro-rated basis in relation to the time served. The Company Manager(s) will use any remaining funds to replace exiting Manager.

(b) In the event that Strasburg Trust's either sells all ownership interest or closes Escrow, Manager(s) Captain will receive 20% percent ownership interest in the Company. Such ownership interest will be paid out over a six-year period. The following is an outline of the percentages of ownership interest to be paid on an annual basis;

| | |
|---|---|
| 1. End of 1st. year | 10% percent, |
| 2. End of 2nd. year | 10% percent, |
| 3. End of 3rd. year | 10% percent, |
| 4. End of 4th. Year | 20% percent, |
| 5. End of 5th. Year | 20% percent, |
| 6. End of 6th. Year | 30% percent. |

In the event the Manager(s) Captain does not complete this Six-Year Term, payment of these ownership interest will be paid on a pro-rated basis in relation to the time served. The Company Manager(s) will use any

8.10.    The initial sale of Membership Interests in the Company to the initial Members has not been qualified or registered under the securities laws of any State, or registered under the Securities Act of 1933, as amended, in reliance upon exemptions from the registration provisions of those laws. No attempt has been made to qualify the offering and sale of Membership Interests to Members under the law of the State of Nevada or any other State, also in reliance upon an exemption from the requirement that a permit for issuance of securities be procured. Notwithstanding any other provision of this Agreement, Membership Interests may not be Transferred or Encumbered unless registered or qualified under applicable State and Federal securities law or unless, in the opinion of legal counsel satisfactory to the Company, such qualification or registration is not required. The Member who desires to transfer a Membership Interest shall be responsible for all legal fees incurred in connection with said opinion.

## ARTICLE IX: DISSOLUTION AND WINDING UP

9.1. The Company shall be dissolved on the first to occur of the following events:

(a) The death, incapacity, or withdrawal of a Member; or the bankruptcy or corporate dissolution of a Member; provided, however, that the remaining Members may, by the Vote of a Majority of Members within 90 days of the happening of that event, Vote to continue the Company, in which case the Company shall not dissolve. If the Majority Members fail to so Vote, the remaining Members shall wind up the Company. For purposes of this Paragraph (a), in determining a Majority of Members, the Percentage Interest of the Member who has died, become incapacitated, withdrawn, or who has become bankrupt or dissolved shall be taken into account.

(b) The expiration of the term of existence of the Company;

(c) The written agreement of all Members to dissolve the Company;

(d) The sale or other disposition of substantially all of the Company Assets;

(e) Entry of a decree of a judicial dissolution.

9.2. On the dissolution of the Company, the Company will engage in no further business other than that necessary to wind up the business and affairs of the Company. The Members who have not wrongfully dissolved the Company will wind up the affairs of the Company. The Persons winding up the affairs of the Company will give written Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members) the remaining assets of the Company will be distributed or applied in the following order of priority:

(a) To pay the expenses of liquidation.

(b) To repay outstanding loans under Article V. If there are insufficient funds to pay such loans in full, each Member will be repaid in the ratio that the Member's respective loan, together with interest accrued and unpaid thereon bears to the total of all such loans from Members, including all interest accrued and unpaid on those loans. Such repayment will first be credited to accrued and unpaid interest due and the remainder will be credited to principal.

(c) Among the Members in accordance with the provisions of Article IV, Section 4.7.

9.3. Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the investment of any Member, such Member shall have no recourse against any other Members for indemnification, contribution, or reimbursement.

## ARTICLE X: DISPUTE RESOLUTION/ARBITRATION

10.1. Before invoking the arbitration mechanism set forth below, the Member bringing the claim shall serve on the other Members written notice of the claim and a copy of all supporting documents. Within 10 business days after service of the notice the responding Members shall serve on the serving party a written response setting out their position. Within five business days after service of the response the parties will meet and discuss resolution of the claim. If the Members cannot reach a satisfactory resolution, the matter will be resolved as set forth below.

10.2. Any action to enforce or interpret this Agreement, or to resolve disputes between the Members, or by or against any Member not settled as set forth above, shall be settled by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive dispute resolution process. Any party may commence arbitration by sending a written demand for arbitration to the other parties. Such demand

TM          P. B.          GS-19.

The prevailing party shall be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration. All decisions of the arbitrator will be final, binding, and conclusive on all parties. Judgement may be entered upon any such decision in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE XI: CONFIDENTIALITY

11.1.    The Members agree to keep in the strictest confidence all information which is developed or provided by any or all of the Members pursuant to this Agreement, including all exclusive information which is developed either for marketing or other techniques regardless of which Member or entity develops such techniques. In addition, any marketing strategies or other technological information, designs or processes which are developed by any Member pursuant to this Agreement will be kept confidential between the Members and the use of any such confidential or proprietary information will only be disclosed or acted upon with the approval of all Members.

## ARTICLE XII: GENERAL PROVISIONS

12.1.    This Agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this Agreement, and it may not be modified or amended in any respect except by written instrument executed by all the parties. This Agreement replaces and supersedes all prior written and oral agreements by and among the Members or any of them.

12.2.    The Agreement may be executed in one or more counterparts, each of, which shall be deemed an original, but all of which together will constitute one and the same instrument.

12.3.    This Agreement shall be construed and enforced in accordance with the laws of the State of Nevada. If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability, or if that is not possible, such provision will, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect.

12.4.    This Agreement will be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

12.5.    The parties to this Agreement will promptly execute and deliver any and all additional documents, instruments, notices, and other assurances, and shall do any and all other acts and things, reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

12.6.    Except as provided in this Agreement, no provision of this Agreement shall be construed to limit, in any manner, the Members in the carrying on of their own respective business or activities.

12.7.    Except as provided in this Agreement, no provision of this Agreement shall be construed to authorize another Member to act as the agent of any other Member.

12.8.    Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

12.9.    The article, section, and paragraph titles and headings contained in this Agreement are inserted as a matter of convenience and for ease of reference only and will be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

12.10. This Agreement may be altered, amended, or repeated only in writing signed by all of the Members.

12.11. Time is of the essence of every provision of this Agreement that specifies a time for performance.

12.12. This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement.

12.13. The Members intend the Company to be a limited liability Company under the laws of the State of Nevada. No Member shall take any action inconsistent with the express intent of the parties to this Agreement.

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement on the day and year first set forth above.

20.

By: _____    Date: 4-7-2006

Peter Blair, Manager/Member


By: _____    Date: 4/7/06

Greg Strasburg, Manager/Member


By: _____    Date: 4 7 06

Dave Moniz, Manager/Member


By: _____    Date: _____

Kevin Smith, Manager/Member


By: _____

Member


By: _____

Member


By: _____

21.

By: _____

Member


By: _____

Member


By: _____

Member


By: _____

Member


By: _____

Member


By: _____

Member


By: _____ 

**EXHIBIT 1**

(Members)

1.    Peter Blair

P.O. Box 6283

San Diego, CA 92166

Phone: 1-800-582-7099

Fax: (619) 224-0382

e-mail: yachtclubllc.com

2.    Gregory A. Strasburg

1201 West 5th Street, Suite T 200

Los Angeles, CA 90017

Phone: (213) 534-3120

Fax: (213) 534-3121

e-mail: gregstrasburg@hotmail.com

3.    David Moniz

3919 Bernice Drive

San Diego, CA 92107

Phone: (619) 222-3824

Cell: (619) 817-6350

e-mail: ycllc@hotmail.com



23.

## EXHIBIT 2

(Monthly Maintenance Expense)

The costs below are the fixed monthly cost. Some of the cost items below may not occur in a given month. Additionally, there may be cost items, which may arise that are not listed or contained herein. The Manager(s) will do their best to notify all Members of any and all potential changes to the monthly expenses in a timely manner.

| | |
|---|---|
| Slip Fees | $ 2,000.00 |
| Electricity | $ 200.00 |
| Insurance | $ 1,000.00 |
| Labor | $ 4,200.00 |
| Food/Beverages | $ 500.00 |
| Accounting/Internet Management | $ 400.00 |
| Satellite Phone/TV | $ 300.00 |
| Total Monthly Expenses | $ 8,600.00 |

NOTE: These costs are estimates as referenced in this Agreement. These costs do not include items of general repair

24.

**EXHIBIT 3**

(Members' Fees)

Manager(s) will notify the Members or guests as to yacht usage cost after a Member or guest informs the Manager(s) of the intended use time period.

The items below are a general guide of what a normal yacht usage would consist of for a week's period of time:

| | |
|---|---|
| Food/Beverages | $ 1,500.00 |
| Fuel Consumption | $ 2,000.00 |
| Filters | $  300.00 |
| General Wear/Tear | $  400.00 |
| Cleaning | $  900.00 |
| Total Cost for Average Seven-Day Yacht Use | $5,100.00 |

NOTE: In the event damage to the vessel occurs due to negligence of a user, additional costs will be incurred.

All costs are estimates and are not limited to the above-referenced items.



25.

**EXHIBIT 4**

(Articles of Organization)

Will be provided upon request.

**EXHIBIT 5**

(Managers)

1.    Peter Blair

P.O. Box 6283

San Diego, CA 92166

Phone: 1-800-582-7099

Fax: (619) 224-0382

e-mail: yachtclubllc.com

2.    David Moniz

3919 Bernice Drive

San Diego, CA 92107

Phone: (619) 222-3824

Cell (619) 817-6350

e-mail: ycllc@hotmail.com

3.    Gregory A. Strasburg

1201 West 5th Street, Suite T 200

Los Angeles, CA 90017

Phone: (213) 534-3120

Fax: (213) 534-3121

e-mail: gregstrasburg@hotmail.com




# EXHIBIT 2

28.

## YACHT CLUB, LLC
## OPERATING AGREEMENT
## ADDENDUM

This Addendum, dated January 25, 2007, is entered into and hereby agreed to by the signing of the parties herein:

### RECITALS

WHEREAS, Mr. James R. Singleton, and/or assigns, does hereby desire to fund and or loan, Yacht Club, LLC, an unsecured interest-only loan.

WHEREAS, The Majority of Managers as signed below and as per the terms and conditions outlined herein, do hereby agree to accept such finding.

NOW THEREFORE, the following terms, conditions and rights are sufficient for the contribution and acceptance of this Addendum.

1)    The amount of such funding will be One Hundred Fifty Thousand US Dollars ($150,000);

2)    This loan will be interest-only with interest payments being made every 30 days from the date of funding;

3)    Full payment of the principal amount ($150,000) will be paid on or before eighteen months has expired from the date of funding;

4)    The monthly interest payment will be Twelve Hundred US Dollars ($1,200), to Bankfirst Account No.091409568: 011 906 0;

5)    No penalty will be assessed in the event the loan is paid in full prior to the expiration of loan;

6)    A fee of Ten Thousand Dollars ($10,000) will be paid in addition to the interest and principal payments;

7)    The ten thousand dollar payment will take place on the following basis;

    a)    $5,000 upon funding of this loan, which is paid from Bankfirst Check #1096, Account No. 091409568: 011 906 0 for the amount of $70,000,

    b)    $5,000 upon retiring of the principal.

8)    In the event a default of the interest or principal payments of this loan occurs, the Lender is hereby authorized to sell the vessel as described as:

        70-ft Queenship
        Hull No.QCWGK115M001
        Loan No. Wachovia Bank Loan No. 105000002514102
        Account No. 5087349986272
        and the following terms and conditions;

    a)    The Loan with Wachovia Bank will be paid first from proceeds of the sale,

PB 29.

Operating Agreement/Addendum
January 25, 2007
Page Two

b) Secondary Lender (James R. Singleton) will be paid second from proceeds of sale,

c) Dave Moniz and Peter Blair will be paid from proceeds of sale, as per the Operating Agreement and Addendum of Yacht Club, LLC, Exhibit 1,

d) Crystal Pure, LLC will receive Two Hundred Fifty Thousand Fifty Thousand US Dollars ($250,000) from proceeds of sale,

e) Attorney fees to be paid to Michael McDonald, Attorney at law upon completion of sale,

f) Any and all funds which are remaining will be paid as follows:

   1) 90% to Gregory A. Strasberg, as Trustee of the Gregory A. Strasberg Revocable Trust,
   2) 07% to Peter Blair, and/or assigns,
   3) 03& to James R. Singleton.

9) Executed Bill of Sale to allow such sale to proceed, will reside with Michael McDonald, Attorney at Law.


IN WITNESS WHEREOF, the parties have executed or caused to be executed, this Addendum on the day and year as set forth above:


YACHT CLUB, LLC

By: _____
Peter Blair
Manager/Member

By: _____
Gregory A. Strasberg, as
Trustee of the  Gregory A. Strasberg
Revocable Trust,
Manager/Member

By: _____
Dave Moniz,
Manager/Member

_____
James R. Singleton,
Lender

30.